J. Cory Faulkner
Ashen|Faulkner
217 N. Jefferson St., Ste. 601
Chicago, IL 60661
(312) 506-4518

Andrew T. Solomon
Caitlin C. Fahey
SULLIVAN & WORCESTER LLP
1633 Broadway
New York, NY 10019
(212) 660-3000

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
-------------------------------------------------------------x

TRUE QUOTE LLC,

     Plaintiff,

   -against-

LIVEVOL, INC.,

     Defendant.

-------------------------------------------------------------x



~~Case No.: _____~~

~~**ANSWER**~~

Case No. 13-cv-9115

Hon. Joan B. Gottschall

**AMENDED ANSWER**

## ~~DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES~~
## ~~AND COUNTERCLAIMS TO TRUE QUOTE, LLC'S COMPLAINT~~

NOW COMES Defendant Livevol, Inc. ("Livevol"), through its attorneys, Sullivan & Worcester LLP, and for its Amended Answer, Affirmative Defenses and Counterclaims to Plaintiff True Quote, LLC's ("True Quote") Complaint, states as follows:

### ANSWER TO COMPLAINT

### PARTIES

1.      At all relevant times, True Quote was an Illinois limited liability company duly organized and existing under the laws of the State of Illinois, with its principal place of business in Cook County, Illinois.  True Quote was formed in 2009 for the purpose of designing and licensing software to be used in the securities trading industry, specifically in connection with the trading of equity options.

**ANSWER**:     Defendant lacks knowledge sufficient to form a belief to admit or deny the allegations in Paragraph 1.

2.      At all relevant times Livevol was a California corporation duly organized and existing under the laws of the State of California, registered and doing business under the laws of the State of Illinois, in the County of Cook, from its offices located at 141 West Jackson Street, Chicago, Illinois, 60604.

**ANSWER**:     Defendant admits the allegations set forth in Paragraph 2.

### VENUE

3.      Venue is proper in Cook County pursuant to 735 ILCS §§ 5/2-101 and 102 because Livevol's registered office is located in Cook County and Livevol conducts business in Cook County.

**ANSWER**:     Defendant admits the allegations set forth in Paragraph 3 insofar as venue is proper pursuant to 28 U.S.C. § 1391.

## FACTS COMMON TO ALL CLAIMS

4.      True Quote is in the business of developing and licensing software to be used in the equity options trading industry (the "Software").  More specifically, the traders of equity index options use the Software, in conjunction with other trading systems, to scan raw data, provided by third parties, for information.  The Software then converts the information into market specific pricing levels upon which the traders may execute trades.  True Quote wholly owns the Software, including, but not limited to, any and all intellectual property related to the Software, and the rights to license the Software.  The Software is entirely unique.

**ANSWER**:     Defendant lacks knowledge sufficient to form a belief to admit or deny the allegations set forth in Paragraph 4 except that Defendant denies that True Quote wholly owns the Software, including, but not limited to, any and all intellectual property related to the Software, and the rights to license the Software.

5.      Livevol is a trading systems provider and is in the business of providing electronic trading systems for individuals to trade products such as equity index options.  Livevol purchases licenses to use third-party software, such as the Software, incorporates that third-party software into its own electronic trading systems, and then markets its electronic trading systems to traders.  Livevol charges traders fees for the use of its trading systems.

**ANSWER**:     Defendant admits the allegations set forth in Paragraph 5 except denies that the Software (which was a stand alone offering) was incorporated into Livevol's electronic trading systems.

6.      On or about May 31, 2011, True Quote and Livevol entered into a Software License Agreement (the "Agreement"), pursuant to which True Quote agreed to license its Software to Livevol to be incorporated into Livevol's trading systems. A true and accurate copy of the Agreement is attached hereto as **Exhibit A.**

**ANSWER**:      Defendant admits the allegations set forth in Paragraph 6.

7.      Under the Agreement, True Quote granted to Livevol a transferable, worldwide, non-exclusive, non-sublicensable and irrevocable license and sublicense (as to any software or portion of the software subject to a license from a third party) to have access to, operate and use the Software, including any enhancements and upgrades thereto.  Exhibit A, ¶ 1.1.

**ANSWER**:      Defendant admits the allegations set forth in Paragraph 7.

8.      Based on the terms of the Agreement, Livevol had no right to sub-license the Software, except as provided by the Agreement, in whole or in part, except on the prior written consent of licensor. Exhibit A, ¶ 1.2.

**ANSWER**:      Defendant admits the allegations set forth in Paragraph 8.

9.      Pursuant to the Agreement, Livevol, as the licensee of the Software, agreed to pay True Quote $1,800 per month per User for the first ten (10) Users and $500 per month for each subsequent User (collectively, the "Fees").  The Agreement defines a "User" to mean any individual customer of Livevol Securities, Inc., a wholly owned subsidiary of Livevol, or any individual employee of an institutional customer of Livevol Securities, Inc. who used the Software under the terms of a software license agreement with Livevol.  Exhibit A, ¶ 2.1.

**ANSWER**:      Defendant admits the allegations set forth in Paragraph 9.

10.     Under the Agreement, True Quote retained all intellectual property rights relating to the Software. Exhibit A, ¶¶ 10.1 - 10.2.

**ANSWER**:    Defendant admits the allegations set forth in Paragraph 10 except that the parties' subsequent employment agreements and proprietary agreements contained present assignment language and assigned all intellectual property rights in any developments relating to the Software made during employment to Livevol.

11.    Under express terms of the Agreement, no modification, alteration or amendment to the Agreement could be made to the Agreement unless the same shall have been, or shall be, in writing and signed by both True Quote and Livevol.  Additionally, any waiver or any provision or breach of any provision of the Agreement must have been, or must be, in writing. Further, the failure of either Livevol or True Quote to enforce at any time any provision of the Agreement shall not be construed to be a waiver of any rights under the Agreement.  Exhibit A, ¶ 12.

**ANSWER**:    Defendant admits the allegations set forth in Paragraph 11 insofar as they characterize the written terms of the Agreement, but denies the allegation insofar as the Agreement was modified or its terms waived by virtue of the parties' subsequent conduct.

12.    After entering into the Agreement, Livevol incorporated the Software into its trading systems, which Livevol marketed to traders. Livevol then directly billed its traders by simply debiting the traders' brokerage accounts. In fact, upon information and belief, approximately 80% of traders who used Livevol's trading systems during the relevant period did so because Livevol's trading systems utilized the Software.  The Software was vital to Livevol's success, as well as for the success for Livevol's subsidiaries.

**ANSWER**:    Defendant denies the allegations set forth in Paragraph 12 except that certain traders paid fees.

13.     Traders using Livevol's trading systems successfully utilized the Software from approximately July 2011 through and including May 2013.

**ANSWER**:     Defendant denies the allegation set forth in Paragraph 13.

14.     Livevol paid True Quote Fees, pursuant to the Agreement, from July 2011 through and including October 2011.

**ANSWER**:     Defendant admits the allegation set forth in Paragraph 14.

15.     From November 2011 through and including May 2013 (the "Relevant Period"), the Fees owed to True Quote for the license and use of the Software, pursuant to the Agreement, total $385,500.00.

**ANSWER**:     Defendant denies the allegation set forth in Paragraph 15.

16.     As of the date of this Complaint (the "Complaint"), Livevol has not paid True Quote the Fees owed to True Quote, pursuant to the Agreement, for the Relevant Period.  Upon not receiving Fees for the Relevant Period, True Quote terminated the Agreement as provided therein.

**ANSWER**:     Defendant denies the allegations set forth in Paragraph 16 except admits that True Quote terminated the Agreement.

17.     True Quote has provided invoices to Livevol representing Fees owed to True Quote for the Relevant Period, pursuant to the Agreement, and has demanded payment. True and correct copies of the invoices provided by True Quote to Livevol are attached hereto as **Exhibit B**.

**ANSWER**:     Defendant denies that it received invoices from True Quote, except in bulk ~~after termination~~for November 2011 through May 2013 two months after True Quote terminated

the Agreement, admits that True Quote has demanded payment, but denies Fees are owed to True Quote.

18.     Despite having charged fees to the traders using its trading systems utilizing the Software, Livevol has unscrupulously and without reason refused to pay True Quote any of the Fees for the Relevant Period owed to True Quote under the terms of the Agreement.

**ANSWER**:     Defendant denies the allegations set forth in Paragraph 18.

**COUNT ONE**
**(Breach of Contract)**

19.     True Quote re-alleges paragraphs 1-18 as if fully set forth herein.

**ANSWER**:     Defendant incorporates by reference its previous responses to the allegations in Paragraphs 1-18 of the Complaint.

20.     The Agreement is a valid and enforceable contract, wherein True Quote offered to license the Software to Livevol, Livevol accepted, and due consideration was given by each party.

**ANSWER**:     Defendant denies the legal conclusions set forth in Paragraph 20.

21.     True Quote fully performed, or substantially performed, under the Agreement by providing the Software to Livevol, including, but not limited to, providing Support as defined by the Agreement.

**ANSWER**:     Defendant denies the allegations set forth in Paragraph 21.

22.     Livevol breached the Agreement when Livevol refused and/or failed to pay True Quote the Fees owed to True Quote for the use of the Software for the Relevant Period pursuant to the Agreement.

**ANSWER**:     Defendant denies the allegations set forth in Paragraph 22.

23.     True Quote has been damaged in the amount of $385,500.00 as a result of Livevol's breach of the Agreement.

**<u>ANSWER:</u>**     Defendant denies the allegations set forth in Paragraph 23.

**<u>COUNT TWO</u>**
**(Unjust Enrichment – In the Alternative)**

24.     True Quote re-alleges paragraphs 1-18 as if fully set forth herein.

**<u>ANSWER:</u>**     Defendant incorporates by reference its previous responses to the allegations in Paragraphs 1-18 of the Complaint.

25.     Livevol agreed to pay True Quote Fees to incorporate the Software into Livevol's trading systems.

**<u>ANSWER:</u>**     Defendant denies the allegations set forth in Paragraph 25.

26.     True Quote agreed to license the Software to Livevol in exchange for Livevol paying True Quote Fees.

**<u>ANSWER:</u>**     Defendant lacks knowledge sufficient to form a belief to admit or deny the allegations in Paragraph 26.

27.     Livevol received the Software from True Quote.

**<u>ANSWER:</u>**     Defendant admits the allegation set forth in Paragraph 27.

28.     Livevol incorporated the Software into its trading systems.

**<u>ANSWER:</u>**     Defendant denies the allegation set forth in Paragraph 28.

29.     Livevol successfully marketed its trading systems, which included the incorporated Software, to traders.

**<u>ANSWER:</u>**     Defendant denies the allegation set forth in Paragraph 29.

30.     Livevol charged the traders who agreed to use Livevol's trading systems, including the Software, fees for using Livevol's trading systems, and the traders who used

Livevol's trading systems, including the Software, paid Livevol fees to use Livevol's trading systems.

**ANSWER:**    Defendant denies the allegation set forth in Paragraph 30.

31.    As of the date of the Complaint, Livevol has not paid True Quote the Fees owed to True Quote by Livevol for the Relevant Period.

**ANSWER:**    Defendant denies the allegation set forth in Paragraph 31.

32.    Livevol has received benefits from the use of the Software.

**ANSWER:**    Defendant denies the allegation set forth in Paragraph 32.

33.    It would be inequitable for Livevol to retain the benefits Livevol received for the use of the Software without paying True Quote for the use of the Software.

**ANSWER:**    Defendant denies the allegation set forth in Paragraph 33.

34.    Allowing Livevol to retain the benefits Livevol received for the use of the Software would result in Livevol unjustly enriching itself at the expense of True Quote.

**ANSWER:**    Defendant denies the allegation set forth in Paragraph 34.

## AFFIRMATIVE DEFENSES

### FACTS COMMON TO ALL AFFIRMATIVE DEFENSES

35.    On or about November 1, 2011, Kimberly Kramer ("Kramer") and Evan Jones ("Jones"), the sole members of True Quote entered into employment agreements with Livevol (the "Employment Agreements").  True and accurate copies of the Employment Agreements are attached hereto as **Exhibit A.**

36.    Following the execution of the Agreement, Livevol and True Quote commenced negotiations for Livevol to acquire True Quote's software (defined above as the "Software") and related intellectual property.  In connection with those negotiations, the parties entered into a

Memorandum of Understanding on August 8, 2011 that outlined the acquisition plan. Had the acquisition closed, Livevol would have hired Kramer and Jones as employees to continue to build on the Software, improve the Software, and ultimately to integrate the Software into Livevol's systems.

37.     By late October 2011, Livevol and True Quote had not finalized the acquisition transaction. But by that point, True Quote had a problem (as revealed by Kramer and Jones): it no longer had the financial means to operate (i.e., pay the vendors' fees and other costs related to the Software). To resolve True Quote's financial problems, Livevol offered to hire Kramer and Jones as employees and to pay True Quote's vendors' fees and Software related costs, and to allow True Quote to use Livevol's technology infrastructure to operate its Software.

38.     True Quote and Livevol explicitly or implicitly agreed that, starting on or about November 1, 2011, in exchange for Livevol hiring Kramer and Jones as salaried employees (with benefits) to work to improve the Software, and for permitting True Quote to use Livevol's technology infrastructure to operate the Software, and for paying True Quote's vendors' fees for services necessary for the operation of the Software, and for permitting True Quote to use Livevol's own vendors and data feeds to operate the Software, True Quote would release Livevol of all payment obligations under the Software License Agreement (defined above as the "Agreement") and cease all invoicing for any User Fees owed under the Agreement (defined above as the "Fees"). Under the Agreement, invoices were required to be submitted on a monthly basis. *See* Plaintiff's Exhibit A, ¶ 2.2.

39.     In accordance with that agreement, from on or about November 1, 2011 through May 24, 2013, Livevol employed Kramer and Jones on a full-time basis and paid each of them a salary plus benefits. During that time, Livevol allowed True Quote to use Livevol's technology

infrastructure to operate the Software, assumed True Quote's payment obligations to True Quote's vendors, paid all vendors' fees for services necessary for the operation of the Software, and permitted True Quote to use Livevol's own vendors and data feeds to operate the Software.

40.    Similarly, from November 1, 2011 to August 8, 2013, True Quote ceased all invoicing of Livevol for Fees under the Agreement.

## First Affirmative Defense

Plaintiff is not entitled to the relief sought in counts I or II of the Complaint as the parties through their respective ~~verbal statements, written agreements and~~ conduct modified the ~~May 31, 2011 Software License~~ Agreement ~~(the "Agreement")~~ such that True Quote was no longer entitled to Fees after November 1, 2011.

## Second Affirmative Defense

Plaintiff is not entitled to the relief sought in counts I or II of the Complaint as the parties' subsequent Employment Agreements and proprietary agreements entered into on or about November 1, 2011 constitute a novation of the Agreement.

## Third Affirmative Defense

The relief sought in counts I or II of the Complaint is barred, in whole or in part, by the ~~doctrines of waiver and/or equitable estoppel.~~ doctrine of waiver.  In particular, True Quote, acting through the words and actions of its agents and members, Kramer and Jones, voluntarily agreed to forego monthly fees under the Agreement in exchange for Livevol's agreement to hire and pay a salary to Kramer and Jones, who would then work to improve the Software so that Livevol could continue to license and exploit the improved Software in its business, permit True Quote to use Livevol's technology infrastructure, vendors and data feeds to operate the Software, and pay True Quote's vendors' fees for services necessary for the operation of the Software.

Subsequent to Livevol's hiring of Kramer and Jones as employees, True Quote ceased to invoice Livevol on a monthly basis or otherwise and made no demand for payment of Fees until just before the initiation of this lawsuit.

**Fourth Affirmative Defense**

The relief sought in counts I or II of the Complaint is barred, in whole or in part, by the doctrine of ~~unclean hands~~equitable estoppel.  True Quote, acting through its agents and members, Kramer and Jones, ceased invoicing Livevol for Fees under the Agreement coincident with Livevol's hiring of Kramer and Jones as employees.  Livevol in good faith believed that True Quote had relinquished its right to compensation under the Agreement and in reliance on that belief continued to employ Kramer and Jones and to pay them to improve the Software. Having ceased its practice of invoicing Livevol in connection with Kramer and Jones's employment, True Quote is estopped from now seeking Fees under the Agreement during the period that Livevol employed Kramer and Jones.

~~**Fifth Affirmative Defense**~~

~~The relief sought in counts I or II of the Complaint is barred, in whole or in part, by the doctrine of set off.~~

~~**Sixth Affirmative Defense**~~

~~Plaintiff is not entitled to the relief sought in counts I or II of the Complaint because of Plaintiff's own breaches of the Agreement.~~

~~**Seventh Affirmative Defense**~~

~~Plaintiff is not entitled to the relief sought in counts I or II of the Complaint because it suffered no injury.~~

## COUNTERCLAIMS

NOW COMES Defendant-Counterplaintiff Livevol, Inc., by and through its attorneys, Sullivan & Worcester LLP, and pursuant to ~~section 2-608(a) of the Illinois Code of Civil Procedure, *735 ILCS 5/2-608(a)*,~~Fed. R. Civ. P. 13 files the following Counterclaims against Plaintiff-Counterdefendant, True Quote, LLC.

## FACTS COMMON TO ALL COUNTERCLAIMS

~~35.     On or about November 1, 2011, Kimberly Kramer ("Kramer") and Evan Jones ("Jones"), the sole members of True Quote entered~~ 41.     Defendant hereby incorporates by reference Paragraphs 1-40 as if they were fully set forth herein.

42.     ~~in employment agreements with Livevol.  A true and accurate copy of the employment agreements is attached hereto as **Exhibit A.**~~

~~36.     From~~ On or about November 1, 2011 ~~through May 24, 2013, Livevol employed~~, Kramer and Jones ~~on a full-time basis and paid each~~, the sole members of ~~them a salary plus benefits.~~

True Quote,~~37.     As employees of Livevol, Kramer and Jones~~ entered into ~~Employee~~ an employment relationship with Livevol to further develop the Software.

43.     From November 1, 2011 to May 24, 2013, Kramer and Jones, as Livevol employees operating under their respective Employment Agreements and Proprietary Information and ~~Inventions~~Invention Agreements (the "Proprietary Agreements~~") with Livevol. By signing the Proprietary Agreements, Kramer and Jones agreed that: "[a]ll Proprietary Information and all rights title and interest in and to patents, patent rights, copyright rights, mask worth rights, trade secret rights, and other intellectual property and proprietary rights anywhere~~

in the world (collectively "Rights") in connection therewith shall be the sole property of the Company. I hereby assign to the Company any and all Rights I may have or that I may acquire during my employment with the Company." A true and accurate copy"), worked to improve the Software.  True and accurate copies of the Proprietary Agreements isare attached hereto as

**Exhibit B.**

44.      As part of38.   In Attachment A to their respective Proprietary Agreementsemployment, Kramer and Jones both checkedagreed that any intellectual property that they had no inventions that they "desire to clarify are not subjectdeveloped, such as improvements to the Company's [Proprietary Agreement]."Software, would belong to Livevol.

3945.   From November 1, 2011 to May 24, 2013, Livevol allowed True Quote to use Livevol's technology infrastructure, vendors and data feeds to operate the Software and paid True Quote's software.

40.      From November 1, 2011 to May 24, 2013, Livevol assumed True Quote's payment obligations to True Quote's vendors, paid all vendors' fees for services necessary for the operation of True Quote's software, and permitted True Quote to use Livevol's own vendors and data feeds to operate the Software.

41.      It wasthe Software.  Absent the services provided to True Quote by Livevol, the Software would have been incapable of performing any of its intended functions; True Quote and Livevol's agreement that, starting on November 1, 2011 in exchangewould have been in breach of the Agreement and any other similar software license agreements with other True Quote customers.  Similarly, it would have been impossible for Livevol hiring Kramer and Jones, permitting True Quote to use Livevol's technology infrastructure to operate True Quote's software, paying True Quote's vendors' fees for services necessary for the operation of True

~~Quote's software, and permitting~~ True Quote to ~~use Livevol's own vendors and data feeds to operate~~make any improvements to the Software.  Livevol's provision of these services allowed True Quote to avoid breaching the Agreement and allowed True Quote to remain in business with its other customers, thereby, continuing to benefit from the Software~~, True Quote would release Livevol of all payment obligations under the Software License Agreement (the "Agreement") and cease all invoicing for Fees.~~ .

46.     Since Kramer and Jones' termination, the improvements to the Software have been in True Quote's possession.

~~42.     From November 1, 2011 to August 8, 2013, True Quote ceased all invoicing of Livevol for Fees under the Agreement.~~

**COUNT I**
**(Quantum ~~Meurit~~Meruit)**
~~43~~

47.     Defendant hereby incorporates by reference Paragraphs ~~35-42~~1-46 as if they were fully set forth herein.

~~44~~48.   Livevol performed services for True Quote, including ~~allowing True Quote the~~improvements to the Software and the related costs associated with the improvements such as use of Livevol's technology infrastructure, ~~paying~~ vendors, and data feeds, and payment of True Quote's vendors' fees~~, and allowing True Quote to use~~ .

49.     Livevol did not perform improvements to the Software gratuitously.

50.     Livevol's ~~vendors and data feeds.~~

~~45.     The services provided to True Quote by Livevol~~ improvements to the Software have a reasonable value.

~~46~~51.   Allowing True Quote to retain the benefit of ~~these services~~the improvements to the Software without paying compensation to Livevol for those improvements would be unjust.

<u>**COUNT II**</u>
**(Unjust Enrichment)**

~~47~~

<u>52</u>.      Defendant hereby incorporates by reference Paragraphs ~~35-42~~<u>1-51</u> as if they were fully set forth herein.

~~48~~<u>53</u>.   True Quote has received benefits from Livevol, including <u>the improvements to the Software and the related costs associated with the improvements such as </u>use of Livevol's technology infrastructure, ~~Livevol's~~<u>vendors, and data feeds, and </u>payment of True Quote's vendors' fees~~, and~~<u> to</u> the ~~use~~<u>detriment</u> of ~~Livevol's vendors and data feeds~~<u>Livevol as Livevol paid for the improved Software that is in True Quote's possession.  True Quote also received benefits to the detriment of Livevol as due to Livevol's provision of services and payment of costs related to the Software, True Quote was able to continue its operation of the Software with its other customers and remain in business</u>.

~~49~~<u>54</u>.   Allowing True Quote to retain ~~these benefits~~<u>the improvements to the Software and the profits of its business operation while being funded by Livevol, without compensating Livevol for its expenses,</u> would violate the fundamental principles of justice, equity and good conscience and would result in True Quote unjustly enriching itself at the expense of Livevol.

~~**COUNT III**~~

~~**(Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030)**~~

~~50.      Defendant hereby incorporates by reference Paragraphs 35-42 as if they were fully set forth herein.~~

~~51.      At the start of her employment with Livevol, Kramer was placed on notice about employee confidentiality obligations and the requirement that Livevol's affiliate, Livevol Securities, Inc ("Livevol Securities") retain and review all e-mail correspondence.~~

52.     On or about May 14, 2013, Livevol conducted a review of Kramer's e-mail activity and discovered that Kramer forwarded Livevol Securities e-mails containing material, non-public, Payment for Order Flow (PFOF) and negotiated rate information proprietary to Livevol Securities, to her personal non-Livevol Hotmail e-mail address.

53.     The proprietary information Kramer forwarded to her personal non-Livevol Hotmail e-mail address was unrelated to True Quote tools and the list of users of those tools.

54.     Despite demand, True Quote has refused to return the material, non-public PFOF and negotiated rate information proprietary to Livevol Securities to Livevol.

55.     The Computer Fraud and Abuse Act, 18 U.S.C. § 1030, (the "CFAA"), regulates fraud and related activity in connection with computers, and makes it unlawful to intentionally access a computer used for interstate commerce, or communication, without authorization or by exceeding authorized access to such a computer, thereby obtaining information from such a protected computer, within the meaning of 18 U.S.C. § 1030(a)(2)(C).

56.     True Quote violated 18 U.S.C. § 1030(a)(2)(C) by intentionally accessing Livevol's computer without authorization or by exceeding authorization, thereby obtaining information from such a protected computer.

57.     The CFAA, 18 U.S.C. § 1030(g) provides a civil cause of action "to any person who suffers damage or loss by reason of a violation of [the CFAA]."

58.     The CFAA, 18 U.S.C. § 1030(a)(5)(A) makes it unlawful to "knowingly cause the transmission of a program, information, code, or command and as a result of such conduct, intentionally cause damage without authorization, to a protected computer," of a loss to one or more persons during any one-year period aggregating at least $5,000 in value.

59.    Livevol's computer is a protected computer which is used in interstate commerce and/or communication within the meaning of 18 U.S.C. § 1030(e)(2)(B).

60.    True Quote violated 18 U.S.C. § 1030(a)(5)(A) by knowingly transmitting Livevol Securities e-mails containing material, non-public, PFOF and negotiated rate information proprietary to Livevol Securities, to Kramer's personal non-Livevol Hotmail e-mail address.

61.    Livevol has suffered loss by reason of these violations, as defined in 18 U.S.C. § 1030(e)(11), by the "reasonable cost…including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."

62.    As a result of this taking, True Quote's conduct has caused a loss to one or more persons during any one-year period aggregating at least $5,000 in value in real economic damage.


WHEREFORE, Defendant Livevol, Inc. requests that the Court enter judgment in ~~their~~its favor and against Plaintiff True Quote, LLC as follows:

     (a)     dismissing the Complaint with costs; or

     (b)     in the alternative, on its cross-claims, awarding damages in an amount to be determined at trial against plaintiff True Quote, LLC for quantum ~~meurit~~meruit or unjust enrichment; and

(c)     ~~awarding damages in an amount to be determined at trial~~

~~against plaintiff True Quote, LLC for violation of 18~~

~~U.S.C. § 1030.~~

(c)     such other and further relief as this Court deems just and

proper.

Respectfully submitted,

Dated:  Chicago, IL                                         LIVEVOL, INC.
~~December 19, 2013~~
February 13, 2014


                                                            By:/s/  J. Cory Faulkner
                                                               One of its Attorneys

*Attorneys for Defendant*

Local Counsel:

J. Cory Faulkner - jcf@ashenlaw.com
Attorney No. 6289457
Ashen|Faulkner
217 N. Jefferson St., Ste. 601
Chicago, IL  60661
(312) 506-4518

Lead Counsel:
Andrew T. Solomon - asolomon@sandw.com
Caitlin C. Fahey - cfahey@sandw.com
SULLIVAN & WORCESTER LLP
1633 Broadway
New York, NY 10019-6708
(212) 660-3000

### CERTIFICATE OF SERVICE

The undersigned certifies that on the 13th day of February, 2014, true and correct copies of this Amended Answer were served electronically via the Court's ECF system, and in compliance with the Federal Rules of Civil Procedure, to the following counsel of record:

Gerald Miller
Brendan P. McGarry
Vanasco Genelly & Miller
33 N. LaSalle St., Suite 2200
Chicago, IL 60602
gmiller@vgmlaw.com
bmcgarry@vgmlaw.com

/s/ J. Cory Faulkner

J. Cory Faulkner